## THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş. AND BORUSAN MANNESMANN PIPE U.S. INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) Court No. 21-00132 |
| Defendant, | ) ) |
| and, | ) ) |
| WHEATLAND TUBE COMPANY AND NUCOR TUBULAR PRODUCTS INC., | ) ) ) |
| Defendant-Intervenors. | ) ) ) |

**BRIEF OF PLAINTIFFS BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş. AND BORUSAN MANNESMANN PIPE U.S. INC. IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Edward J. Thomas, III
Jordan L. Fleischer

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

September 2, 2021

*Counsel to Plaintiffs Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and Borusan Mannesmann Pipe U.S. Inc.*

## TABLE OF CONTENTS

I.   ADMINISTATIVE DETERMINATION UNDER REVIEW............................................. 1

II.  ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
     ADMINISTRATIVE DETERMINATION ................................................................ 2

III. STATEMENT OF FACTS ............................................................................................. 2

IV.  STATEMENT OF THE CASE ....................................................................................... 4

V.   SUMMARY OF ARGUMENT .................................................................................... 12

VI.  ARGUMENT ............................................................................................................... 13

     A. Standard Of Review ............................................................................................. 13

     B. Commerce's Deduction Of Section 232 Duties From EP And CEP Is Contrary To
        The Antidumping Statute As Authoritatively Interpreted By Commerce And
        Affirmed By The Federal Circuit ......................................................................... 14

        1. Section 232 Duties Are Remedial ................................................................... 15

        2. Section 232 Duties Are Temporary ................................................................. 20

        3. Subtracting Section 232 Duties From EP Or CEP Results In Precisely The Type
           Of Double Remedy The Federal Circuit Rejected In *Wheatland* ...................... 22

        4. Congress' Delegation Of Authority To The President To Impose Duties Under
           Section 232 And The President's Subsequent Modification To Chapter 99 Of The
           Harmonized Tariff Schedule Demonstrate That Section 232 Duties Are "Special
           Duties" As Opposed To "Ordinary" Customs Duties ........................................ 27

     C. Commerce's Determination To Deduct Section 232 Duties From U.S. Price In
        Excess Of 25 percent Is Unsupported By Substantial Evidence And Is Otherwise
        Not In Accordance With Law ............................................................................... 29

VII. CONCLUSION ............................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*,
   494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ..........................................................17, 18, 21, 25

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)........................................................................................................................9

*F.C.C. v. Fox Televisions Stations, Inc.*,
   556 U.S. 502 (2009)......................................................................................................................14

*Forest Labs., Inc. v. United States*,
   29 CIT 1401, 403 F. Supp. 2d 1348 (2005) ............................................................................ 27-28

*Hoogovens Staal BV v. United States*,
   22 CIT 139, 4 F. Supp. 2d 1213 (1998)..........................................................................................7

*Save Domestic Oil, Inc. v. United States*,
   357 F.3d 1278 (Fed. Cir. 2004)....................................................................................................14

*Scott v. Wilkie*,
   920 F.3d 1375 (Fed. Cir. 2019)....................................................................................................26

*Securities & Exchange Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947)......................................................................................................................26

*Transpacific Steel LLC v. United States*,
   466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) ......................................................................3, 12, 30

*Transpacific Steel LLC v. United States*,
   474 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ...............................................................................30

*Transpacific Steel LLC v. United States*,
   840 Fed. Appx. 517 (Fed. Cir. 2020).............................................................................................31

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) .........................................................................................................3

*U.S. Steel Grp. v. United States*,
   22 CIT 670, 15 F. Supp. 2d 892 (1998)..........................................................................................7

*Universal Steel Prods., Inc. v. United States*,
   495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) ...............................................................................20

*Wheatland Tube Company v. United States*,
495 F.3d 1355 (Fed. Cir. 2007)..................................................................... *passim*

**U.S. Constitution**

U.S. Const. art. I, § 8...........................................................................................27

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................13

19 U.S.C. § 1675(a)(2).........................................................................................7

19 U.S.C. § 1677(7)...........................................................................................16

19 U.S.C. § 1677a................................................................................................7

19 U.S.C. § 1677a(a)............................................................................................7

19 U.S.C. § 1677a(b)............................................................................................7

19 U.S.C. § 1677a(c)(2)(A)........................................................................... *passim*

19 U.S.C. § 1862.................................................................................................3

19 U.S.C. § 1862(b).............................................................................................4

19 U.S.C. § 1862(c)(1)(A)(ii).........................................................................4, 20

19 U.S.C. § 1862(d)....................................................................................5, 16, 17

19 U.S.C. § 2251 *et seq*.........................................................................................7

19 U.S.C. § 2252(b).........................................................................................7, 18

19 U.S.C. § 2252(c)...................................................................................16, 17, 25

19 U.S.C. § 2253(a)(3).........................................................................................7

19 U.S.C. § 2411...............................................................................................28

19 U.S.C. § 3004 (1994).....................................................................................28

**Regulations**

19 C.F.R. § 351.202(b)(4)..................................................................................26

**Other Authorities**

*Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the Harmonized System*,
Inv. No. 332-131, USITC Pub. 1400 (June 1983) ...................................................29

Harmonized Tariff Schedule of the United States (2021) Revision 7 .........................28

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84
Fed. Reg. 33,739 (Dep't Commerce July 15, 2019) ...............................................2

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ................................................ *passim*

*Proclamation 9711 of March 22, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13,361 (Mar. 28, 2018) ...........................................6, 21

*Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683 (May 7, 2018)...............................................6, 21

*Proclamation 9759 of May 31, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25,857 (June 5, 2018)..............................................6, 21

*Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018)........................................ *passim*

*Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019)........................................6, 21, 30

*Proclamation 9894 of May 19, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,987 (May 23, 2019)..............................................21

*Proclamation 9980 of January 24, 2020 Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85
Fed. Reg. 5,281 (Jan. 29, 2020) ...................................................................21

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40,202 (Dep't Commerce July 6, 2020)..................... *passim*

Renegotiation Amendments Act of 1968, S. Rep. No. 90-1385, pt. 2 (1968)..............................27

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004) ........................................................... *passim*

*Section 232 Steel and Aluminum Tariff Exclusions Process*, 85 Fed. Reg. 81,060
(Dep't Commerce Dec. 14, 2020)..............................................................21

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, SENIOR JUDGE**

_____

|  |  |  |
|---|---|---|
| | ) | |
| BORUSAN MANNESMANN BORU SANAYI | ) | |
| VE TICARET A.Ş. AND BORUSAN MANNESMANN | ) | |
| PIPE U.S. INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 21-00132 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| WHEATLAND TUBE COMPANY AND | ) | |
| NUCOR TUBULAR PRODUCTS INC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |
| | ) | |

_____

**BRIEF OF PLAINTIFFS BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş. AND BORUSAN MANNESMANN PIPE U.S. INC. IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiffs Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB") and Borusan

Mannesmann Pipe U.S. Inc. ("BMP") (collectively, "Borusan" or "Plaintiffs"), file this brief in

support of their Rule 56.2 Motion for Judgment On the Agency Record.

**I.     ADMINISTATIVE DETERMINATION UNDER REVIEW**

The administrative determination under review is the U.S. Department of Commerce's

("Commerce") _Final Results_ in the 2018-2019 antidumping ("AD") duty administrative review

of circular welded carbon steel standard pipe and tube products ("standard pipe" or "subject

merchandise") from Turkey.  _Circular Welded Carbon Steel Standard Pipe and Tube Products_

_from Turkey:  Final Results of Antidumping Duty Administrative Review and Final_

1

*Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 15,190 (Dep't Commerce Mar. 22, 2021) ("*Final Results*") (PR Doc. 135),[1] and accompanying Issues and Decision Memorandum ("*Final Results IDM*") (PR Doc. 129).

II.     **ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION**

The issues of law presented include the following:

1.  Whether Commerce's determination to treat section 232 duties as United States import duties and deduct them from BMB's export price ("EP") and constructed export price ("CEP") is unsupported by substantial evidence and is otherwise not in accordance with law?

2.  Whether Commerce's determination to deduct section 232 duties from U.S. price in excess of 25 percent is unsupported by substantial evidence and is otherwise not in accordance with law?

III.    **STATEMENT OF FACTS**

On July 15, 2019, Commerce initiated the May 1, 2018 – April 30, 2019 administrative review of the AD order on standard pipe from Turkey. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33,739 (Dep't Commerce July 15, 2019) ("*Initiation Notice*").  Commerce's period of review ("POR") for this administrative review is May 1, 2018 – April 30, 2019.  *Id.* at 33,748

On August 28, 2019, Commerce selected BMB as the sole mandatory respondent to be individually reviewed.  *See* CR Doc. 4 (PR Doc. 22).

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR Doc." or "CR Doc.") followed by the page or exhibit number.

At Commerce's direction, Borusan reported in its AD response duties paid under section 232 of the Trade Expansion Act of 1962 ("section 232"), *as amended*, 19 U.S.C. § 1862, at the time of entry for all merchandise sold in its EP sales transactions.  CR Docs. 26-54 (PR Docs. 46-48) at C-61 to C-63 and Exhibit C-1.  On July 23, 2020, Commerce published the *Preliminary Results* of its administrative review.  *Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019*, 85 Fed. Reg. 44,509 (Dep't Commerce July 23, 2020) ("*Preliminary Results*") (PR Doc. 134), and accompanying Decision Memorandum (PR Doc. 97).  Commerce calculated a 12.03 percent estimated weighted-average dumping margin for Borusan.  PR Doc. 134 at 44,511.  Commerce treated the section 232 duties paid by BMB as United States import duties and deducted them from BMB's EP and CEP sales, PR Doc. 97 at 10-12, including those section 232 duties collected pursuant to *Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018), which was held to be unlawful and unconstitutional by this Court, *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1259-60 (Ct. Int'l Trade 2020), *rev'd*, 4 F.4th 1306 (Fed. Cir. 2021), *petition for reh'g filed*, No. 2020-2157 (Fed. Cir. Aug. 23, 2021), ECF No. 68.  Borusan challenged Commerce's treatment of section 232 duties in its briefing before Commerce.  CR Doc. 123 (PR Doc. 114) at 1-17.  Borusan also notified Commerce regarding the litigation surrounding *Proclamation 9772* and the status of refunds of the unlawfully collected section 232 duties for entries subject to the administrative review.  PR Doc. 122; PR Doc. 125.  However, Commerce continued to deduct section 232 duties on EP and CEP sales, including those collected pursuant to *Proclamation 9772*, in the *Final Results*.  PR Doc. 129 at 21-24.

IV.    **STATEMENT OF THE CASE**

Section 232 authorizes the President to take action "to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).  Section 232(b) directs the Secretary of Commerce (hereinafter, "Secretary"), upon the application of any department or agency, the request of an interested party, or on his own motion, to undertake an investigation to determine the effects of the imports of a particular article of commerce on the national security of the United States.  *Id.* § 1862(b).

After following certain procedural steps, and within 270 days of initiating the investigation, the Secretary is required to submit a report to the President, which includes his findings on whether that "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," and his recommendations for action by the President.  *Id.* § 1862(b)(3)(A).  Under section 232(c), the President then has 90 days to determine whether to concur with the findings of the Secretary, and if he concurs, to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of {that} article and its derivatives so that such imports will not threaten to impair the national security."  *Id.* § 1862(c)(1)(A)(ii).

Significantly, section 232(d) directs that in considering the requirements of "national security," the President and Secretary shall consider, among other factors, the impact of competition from imports on the economic welfare of particular U.S. domestic industries including the consideration of economic and financial effects on those industries:

> the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports

4

shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

*Id.* § 1862(d).

On April 19, 2017, pursuant to section 232, the Secretary opened an investigation into the impact of steel imports on the national security, and on January 11, 2018, the Secretary provided the President with a report of findings and recommendations. *Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40,202 (Dep't Commerce July 6, 2020) (hereinafter, "*Steel Report*"). The Secretary found that imports of steel were adversely affecting the economic welfare of the U.S. domestic steel industry. *Id.* at 40,204. The Secretary based this determination on multiple indicia of injury, including increasing import volumes, high import penetration levels, a high import to export ratio, declining prices, plant closures and reductions in steel-making capacity, declining steel prices, and bids lost to import competition. *Id.* at 40,204, 40,209-18. The Secretary further concluded that these effects from imports were causing financial distress to the U.S. steel industry. *Id.* at 40,216-22. The Secretary attributed these adverse effects to a number of factors, including dumping and subsidization, noting that antidumping and countervailing duty orders on finished steel products had increased by 60 percent since 1998. *Id.* at 40,216. Based on these and other factors, the Secretary determined that

> the displacement of domestic steel by excessive imports and the consequent adverse impact of those quantities of steel imports on the economic welfare of the domestic steel industry, along with the circumstance of global excess capacity in steel, are 'weakening our internal economy' and therefore 'threaten to impair' the national security as defined in Section 232.

*Id.* at 40,224.

5

To alleviate this threat, the Secretary recommended immediately implementing import duties or quotas in an amount sufficient to enable domestic steel plants to operate at utilization levels of at least 80 percent of capacity. *Id.* at 40,225. The Secretary determined that such a utilization rate by the steel plants could be achieved by reducing steel imports from 36 million to 23 million metric tons. *Id.* The Secretary presented several alternatives to achieve that reduction: an import quota limiting imports of steel to 63 percent of 2017 levels; a tariff of 24 percent on all steel imports, or a tariff of 53 percent for steel imports from twelve countries. *Id.* at 40,226.

In response to the Secretary's recommendations in the *Steel Report*, on March 8, 2018, the President issued a proclamation pursuant to his authority under section 232 that imposed a 25 percent *ad valorem* tariff on imported steel articles, including standard pipe, from all countries except Canada and Mexico. *Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018). The President subsequently modified the section 232 regime on steel imports via three additional proclamations, the result of which was to impose 25 percent section 232 duties on steel from almost all countries other than South Korea, Argentina, Australia, and Brazil. *See Proclamation 9711 of March 22, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13,361 (Mar. 28, 2018); *Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683 (May 7, 2018); *Proclamation 9759 of May 31, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25,857 (June 5, 2018). The President also increased the section 232 duties on Turkey to 50 percent during the POR in August 2018 and subsequently lowered them back down to 25 percent shortly after the end of the POR. *Proclamation 9772*, 83 Fed. Reg. 40,429; *Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019).

6

In an AD administrative review, Commerce determines the dumping margin, if any, on goods subject to an AD duty order by comparing the EP or CEP of the goods, to their normal value.  19 U.S.C. § 1675(a)(2).  EP and CEP are determined under 19 U.S.C. § 1677a as the price at which the merchandise is first sold or agreed to be sold to an unaffiliated purchaser, subject to certain adjustments.  *Id.* § 1677a(a) & (b).  Among the adjustments provided for by the statute is that the EP or CEP are to be reduced by the amount of "United States import duties" included in the price.  *Id.* §1677a(c)(2)(A).

The term "United States import duties" is not defined by the statute.  However, Commerce has long recognized that not all types of duties on imported merchandise are to be deducted as "United States import duties."  For example, Commerce has never deducted AD duties or countervailing ("CVD") duties from U.S. price on the ground that it would be circular to deduct AD or CVD duties in order to calculate the amount of AD duties.  *See Hoogovens Staal BV v. United States*, 22 CIT 139, 146, 4 F. Supp. 2d 1213, 1220 (1998) (affirming Commerce's practice of not deducting AD duties from the initial price in the United States as either U.S. import duties or as costs); *U.S. Steel Grp. v. United States*, 22 CIT 670, 677-80, 15 F. Supp. 2d 892, 898–900 (1998) (affirming Commerce's practice of not deducting either AD nor CVD duties from the starting price in the United States in calculating AD duties).

In 2004, Commerce was faced with the question of whether safeguard duties imposed under section 201 of the Trade Act of 1974 ("section 201"), *as amended*, 19 U.S.C. § 2251 *et seq.*, should be deducted from the starting price as United States import duties.[2]  In *Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative*

---

[2] Section 201 duties may be imposed by the President, upon the recommendation of the U.S. International Trade Commission ("ITC"), in response to surges in imports that are a substantial cause of serious injury or threat thereof.  *See* 19 U.S.C. §§ 2252(b) & 2253(a)(3).

*Review*, 69 Fed. Reg. 19,153, 19,157-61 (Dep't Commerce Apr. 12, 2004) ("*SSWR from Korea*"),

Commerce issued an interpretation of the statutory term "United States import duties" following

formal notice and comment procedures.  Commerce examined the legislative history of the

Antidumping Act of 1921, from which section 1677a(c)(2)(A) derives, and concluded that the

term "United States import duties" was intended to apply only to "normal customs duties" and

did not cover "special duties" such as AD duties.  *Id.* at 19,159.  Commerce further concluded

that section 201 duties were properly treated as special duties, rather than as normal customs

duties, and thus were not to be deducted from U.S. price under section 1677a(c)(2)(A).  *Id.*

19,159-61.  Commerce reasoned that section 201 safeguard duties are properly considered to be

special duties because they are remedial duties that are temporary in nature.  *Id.* at 19,159.

Unlike normal duties, Commerce noted that section 201 duties are contained in Chapter 99 of the

Harmonized Tariff Schedule of the United States ("HTSUS"), which is reserved for special or

temporary duties.  *Id.* at 19,160.  Additionally, Commerce found that deducting section 201

duties from the starting U.S. price would result in an improper double remedy by imposing the

section 201 duties a second time in the form of a dollar-for-dollar increase in AD duties.  *Id*.

Commerce concluded that nothing in the legislative history of either section 201 or the AD

statute indicated that Congress intended section 201 duties to be effectively doubled in the cases

of goods subject to AD orders, or for the imposition of section 201 duties to create a dumping

margin where none otherwise existed.  *Id.*

 In *Wheatland Tube Company v. United States*, 495 F.3d 1355 (Fed. Cir. 2007), the U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed Commerce's statutory

interpretation.  Emphasizing that Commerce's statutory interpretation in *SSWR from Korea* had

been the product of formal notice-and-comment rulemaking, the court concluded that

Commerce's construction of the term United States import duties qualified for deference

pursuant to *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

*Wheatland*, 495 F.3d at 1360 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).

Applying step two of *Chevron*, the court concluded that Commerce's reliance on the legislative

history of the Antidumping Act of 1921 was reasonable and Commerce appropriately concluded

that Congress did not intend all duties on imported goods to be considered "United States import

duties" within the meaning of 19 U.S.C. § 1677a(c)(2)(A).  *Id.* at 1361.

The Federal Circuit also affirmed as reasonable Commerce's determination that section

201 safeguard duties were properly considered special duties that, like AD and CVD duties,

should not be deducted from EP and CEP.  *Id.* at 1361-63.  The court rejected the U.S. Court of

International Trade's ("CIT") conclusion that AD duties and section 201 duties should be treated

differently because they remedied "distinct harms" and "dissimilar trade distortions."  *Id.* at 1363.

The court observed that AD and CVD duties also remedy distinct harms and dissimilar trade

distortions, yet neither are considered "United States import duties" for purposes of 19 U.S.C.

§ 1677a(c)(2)(A).  *Id.*  The court concluded that while AD duties, CVD duties, and section 201

duties all in a sense remedy distinct harms, "they are all directed at the same overarching purpose

– protecting the bottom line of domestic producers."  *Id.* at 1363-64.

The court noted with approval Commerce's observation that "antidumping duties and

§ 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical

findings that domestic industry is being injured or threatened with injury due to the imported

merchandise."  *Id.* (citing *SSWR from Kore*, 69 Fed. Reg. at 19,159-60).  Thus, the court

concluded that

> Given the similarities between antidumping duties and § 201 safeguard duties and
> given the fact that § 201 safeguard duties were not enacted until 1974 and

therefore could not have been considered either "United States import duties" under § 1677a(c)(2)(A) as originally enacted in 1921 or "special dumping duties," it was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties."  Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as antidumping duties and not deduct them from the EP when calculating dumping margin.

*Id.* (citations omitted).

Finally, the court affirmed as reasonable Commerce's finding that "if § 201 safeguard duties were included as 'United States import duties' for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice."  *Id.* (citing *SSWR from Korea*, 69 Fed. Reg. at 19,160).  The court quoted in full Commerce's explanation that:

Where there is a pre-existing dumping margin, deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin. Where there was no pre-existing dumping margin, the deduction of 201 duties from U.S. prices in an AD proceeding could create a margin. Nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results.

*Id.* at 1363 (quoting *SSWR from Korea*, 69 Fed. Reg. at 19,160).

In the instant AD duty administrative review, Commerce purported to apply the framework that it adopted via notice-and-comment rulemaking in *SSWR from Korea* for determining whether duties qualify as "United States import duties."  However, Commerce determined that unlike section 201 duties, section 232 duties are properly treated as normal customs duties and deducted as "United States import duties," under 19 U.S.C. § 1677a(c)(2)(A). PR Doc. 129 at 21.  Commerce acknowledged that pursuant to the statutory interpretation announced in *SSWR from Korea* and affirmed by the Federal Circuit in *Wheatland*, the question of whether section 232 duties should be deducted turned on whether section 232 duties should be considered "normal customs duties" or "special customs" duties.  *Id.* at 21-22.  Unlike in *SSWR*

10

*from Korea*, however, Commerce did not undertake a comprehensive analysis of whether section

232 duties operate more like normal duties or like remedial special duties.  Rather, Commerce

confined its analysis to identifying alleged differences (without analyzing similarities) between

the remedies provided by section 232 duties and section 201 duties in light of the factors

Commerce adopted in *SSWR from Korea*.  *Id.* at 22-23.  Commerce determined that the fact that

section 232 duties are imposed to address national security concerns, as that term is used in

section 232, distinguished section 232 duties from AD duties, CVD duties, and section 201

duties.  *Id.*  Commerce concluded

> the section 232 duties were implemented pursuant to a concern of safety and
> security for the entire United States, and not to protect a single enterprise or
> industry.  Accordingly, we find that the national security purpose of section 232
> duties is vastly different than the purpose of antidumping duties or section 201
> safeguard measures.

*Id.* at 22.

 Regarding the issue of a double remedy, Commerce concluded that, unlike section 201

duties, subtracting section 232 duties would not lead to double counting because "the function of

antidumping duties and section 232 duties are separate and distinct, such that there would be no

overlap between the two in providing the remedies sought by each."  *Id.* at 23.  Although section

232 does not grant the President the power to modify the AD laws, Commerce observed that the

annex to the presidential proclamation referred to section 232 duties as "ordinary" customs

duties and provided that "{a}ll anti-dumping or countervailing duties, or other duties and charges

applicable to such goods shall continue to be imposed, except as may be expressly provided

herein."  *Id.* (quoting *Proclamation 9740*, 83 Fed. Reg. at 20,687); *see also Proclamation 9705*,

83 Fed. Reg. at 11,629.  According to Commerce, the absence of any such express provision

exempting standard pipe from the AD duties that otherwise would apply meant that the section

232 duties should be deducted as normal import duties.  "Had the President intended that

antidumping duties be reduced by the amount of section 232 duties imposed, the Presidential

Proclamation would have expressed that intent."  PR Doc. 129 at 23.

During the proceedings at Commerce for this POR, this Court held that the proclamation

which imposed 50 percent section 232 duties on imports of steel from Turkey from August 13,

2018 – May 20, 2019 – *Proclamation 9772* – was unlawful and void and thus the Court ordered

U.S. Customs and Border Protection ("CBP") to refund half of the section 232 duties.

*Transpacific*, 466 F. Supp. 3d at 1259-60.  Many of Plaintiffs' entries were subject to

*Proclamation 9772* as the POR for this administrative review was May 1, 2018 – April 30, 2019.

*See* CR Docs. 26-54 (PR Docs. 46-48) at C-61 to C-63 and Exhibit C-1.  Plaintiffs subsequently

notified Commerce regarding the *Transpacific* litigation and the section 232 duty refunds being

issued.  PR Doc. 122; PR Doc. 125.  Plaintiffs provided Commerce with a method for adjusting

the section 232 duties reported in its U.S. sales database and also offered to provide Commerce

with any additional information required.  PR Doc. 125.  However, Commerce declined to lower

the total amount of section 232 duties paid in the U.S. sales database to remove the unlawfully

collected section 232 duties as it decided that:  1) *Transpacific* is not final; 2) no evidence has

been submitted to show that refunds have been provided by CBP to the relevant importers; 3)

there is no evidence on the record that exporters or producers set prices in reliance on a promise

of potential post-sale refunds pursuant to subsequent court decisions; and 4) there is no evidence

on the record of post-sale refunds from the exporters and producers to the ultimate consumers.

PR Doc. 130.  This appeal followed.

## V.   <u>SUMMARY OF ARGUMENT</u>

Commerce's determination that section 232 duties constitute "United States import duties"

with the meaning of 19 U.S.C. § 1677a(c)(2)(A) cannot be squared with its previous decisions

not to treat section 201, AD, and CVD duties as "United States import duties."  The decisions of

the Federal Circuit and the U.S. Supreme Court require agencies to adhere to their adopted policies unless they provide a reasoned explanation for the change.  Yet, Commerce offered no such reasoning here.  Instead, it accepted the applicability of the framework it adopted through notice-and-comment rulemaking for evaluating whether a class of duties constitute "United States import duties."  Commerce then applied the framework in a way so different from its past application that its action amounted to a *sub silentio* change in policy.

Considered properly in light of the factors Commerce has deemed relevant, section 232 duties are not "United States import duties" because 1) they are remedial duties, like section 201, AD, and CVD duties, 2) they are temporary in nature, rather than permanent, and 3) treating them as "United States import duties" would result in collecting the section 232 duties twice, once as section 232 duties and a second time as the result of an increased dumping margin.

Commerce's determination to deduct section 232 duties from U.S. price that were in excess of 25 percent and that were declared unlawful is not supported by substantial evidence and otherwise not in accordance with law.  Plaintiffs kept Commerce aware of the *Transpacific* litigation and the status of the section 232 duty refunds throughout the course of the administrative review, but Commerce failed to ask any follow up questions.  Commerce's objections to giving effect to the *Transpacific* decision in its AD calculations are meritless and not relevant to the issue at hand and cannot be sustained by this Court.

## VI.   <u>ARGUMENT</u>

### A.   Standard Of Review

In reviewing a challenge to Commerce's determination in an AD administrative review, the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

13

**B.      Commerce's Deduction Of Section 232 Duties From EP And CEP Is Contrary To The Antidumping Statute As Authoritatively Interpreted By Commerce And Affirmed By The Federal Circuit**

Commerce's determination that section 232 duties constitute "United States import duties"—*i.e.*, normal customs duties, rather than special duties—for purposes of 19 U.S.C. § 1677a(c)(2)(A), is directly contrary to Commerce's authoritative interpretation of section 1677a(c)(2)(A) in *SSWR from Korea* and the decision of the Federal Circuit in *Wheatland*.  To be sure, Commerce retains the power to change its interpretation of the statutory phrase "United States import duties" if it explains its rationale and its new construction of the statute is reasonable.  *See F.C.C. v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that courts must sustain an agency's change in policy when they find that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.").  In this case, however, Commerce purported to follow the framework it adopted in *SSWR from Korea* for assessing whether particular charges on imports constitute "United States import duties."  Under that framework, duties imposed pursuant to statutes passed after the Antidumping Act of 1921 are not considered "United States import duties" under section 1677a(c)(2)(A) if the duties are 1) temporary, 2) remedial, and 3) if treating the duties as "United States import duties" would result in a double remedy.  *SSWR from Korea*, 69 Fed. Reg. at 19,159-60.  Having applied the framework from *SSWR from Korea*, Commerce may not "depart from {its} prior policy *sub silentio* or simply disregard rules that are still on the books."  *Fox Televisions Stations*, 556 U.S. at 515.  Rather, having declined to explicitly change its framework for interpreting the phrase "United States import duties," Commerce must apply that framework consistently to like cases. *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("{I}f

Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").

As was true of section 201 duties, the section 232 statute was first enacted many years after the Antidumping Act of 1921 and thus any duties imposed under it could not have been considered "United States import duties" by the Congress that enacted the Antidumping Act of 1921.  Section 232 duties are indistinguishable from section 201 duties with regard to each of the factors that led Commerce and the Federal Circuit to find that section 201 duties are special duties.  Additionally, section 232 duties, like section 201 duties, are expressly designated as special duties in the HTSUS.

### 1.    Section 232 Duties Are Remedial

In *Wheatland*, the Federal Circuit affirmed Commerce's finding that the remedial nature of section 201 duties supported the conclusion that they were special duties rather than normal customs duties.

> Like antidumping duties . . . safeguard duties are remedial duties that provide relief from the adverse effects of imports. . . . Normal customs duties, in contrast, have no remedial purpose.  They are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

*Wheatland*, 495 F.3d at 1362; *see also SSWR from Korea*, 69 Fed. Reg. at 19,159.  In the *Final Results*, however, Commerce concluded that section 232 duties are not remedial in nature because section 232 duties are not focused on remedying injury to domestic producers but instead are focused on ensuring that imports do not threaten to impair national security.  PR Doc. 129 at 22.  This conclusion conflicts with the express language of section 232, as well as the Secretary's conclusions in the *Steel Report* and those of the President as stated in *Proclamation 9705*.  *Proclamation 9705*, 83 Fed. Reg. at 11,625-28; *Steel Report*, 85 Fed. Reg. at 40,209-24.

Each of these sources make it abundantly clear that section 232 duties are directly focused on remedying injury to the domestic steel industry caused by the economic effects of imported steel.

The text of section 232 makes clear that in considering threats to "national security" the Secretary and the President are to focus on the economic impact of imports on domestic producers and industries. Section 232(d) directs the Secretary and the President to recognize "the close relation of the economic welfare of the Nation" to national security and to

> *take into consideration the impact of foreign competition on the economic welfare of individual domestic industries*; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports.

19 U.S.C. § 1862(d) (emphasis added). Thus, contrary to Commerce's assertion, remedying the impact of the imports being investigated on the economic welfare of U.S. domestic industries is a primary focus of the statute. Not surprisingly, these factors in section 232 bear a striking similarity to the economic factors that the ITC is required to consider when conducting material injury determinations under the AD law and determinations of serious injury under section 201.

In making material injury determinations under the AD law, the statute directs the ITC to consider, among other factors, the volume of imports and whether imports are increasing absolutely or relative to domestic production or consumption; whether there has been price underselling by imports and whether imports are depressing prices or preventing price increases; and whether imports are adversely affecting the domestic industry's output, sales, market share, profits, ability to service debt, return on assets, and capacity utilization. *Id.* § 1677(7). Similarly, section 201 defines "serious injury" to mean "a significant overall impairment in the position of a domestic industry," *id.* § 2252(c)(6), and directs the ITC to base its determination on factors that include the significant idling of domestic production facilities; the inability of a significant number of firms to operate at "reasonable" profit levels; declines in market share, profits, wages,

16

productivity, and employment; the inability of producers to generate capital to finance

modernization of production facilities; and declines in the market share of domestic producers, *id.*

§ 2252(c)(1).  The Secretary's *Steel Report* analyzed nearly all of these same factors.  *Steel*

*Report*, 85 Fed. Reg. at 40,209-24.

Furthermore, it is clear that remedying injury to the domestic steel industry caused by

imported steel was in fact a primary focus of the Secretary in the *Steel Report* and of the

President in *Proclamation 9705*.  The *Steel Report*'s principal conclusion is that steel imports

were "in such quantities" as to "adversely impact the economic welfare of the U.S. steel industry."

*Id.* at 40,210.  The Secretary supported this conclusion with findings that steel imports were

increasing; that imports held a high market share and exhibited a high import to export ratio; that

domestic producers faced downward price pressure; that the domestic industry was suffering

from plant closures and eroding steel mill capacity; that domestic employment was declining;

and that the domestic industry was in financial distress.  *Id.* at 40,210-20.  In imposing the 25

percent tariff on imported steel, the President specifically referenced these findings of the

Secretary in concurring with the conclusion that steel articles were being imported in such

quantities and under such circumstances as to threaten national security.  *Proclamation 9705*, 83

Fed. Reg. at 11,625-26.

In reviewing the Final Results of the previous review, this Court agreed with Borusan

that section 232 duties are remedial in a "broad sense."  *Borusan Mannesmann Boru Sanayi Ve*

*Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2021).  Citing the

discussion of the term "national security" in 19 U.S.C. § 1862(d), the Court concluded that

section 232 duties are remedial, "not in the sense of AD/CV duties but more closely to the sense

of remediation reflected in Section 201" because neither section 232 nor section 201 require a

finding of an unfair trade practice.  *Id*.  The Court went on, however, to note that section 201

requires a particular level of injury (*i.e.*, "serious injury," *see* 19 U.S.C. § 2252(b)), while section

232 may be used to promote vital nascent industries and not just established industries, *Borusan*,

494 F. Supp. 3d at 1374.  Given these distinctions, the Court concluded, Commerce's reasoning

on the issue of whether 232 duties were remedial was "not the strongest," but was not

"completely bereft of logic."  *Id.*

        Commerce's focus on fine distinctions among the specific remedial purposes and

objectives of the AD/CVD laws, section 201, and section 232 misses the point.  As explained by

the Federal Circuit in *Wheatland*, the issue is not whether the types of duties being compared are

directed at remedying the exact same harm.  Rather, the point is that all of these remedial duties

exist to provide *some kind* of remedy to the domestic industry from any adverse effects of

imports.  On the other hand, "{n}ormal customs duties . . .  have no remedial purpose.  They are

imposed regardless of whether the U.S. industry is suffering adverse effects as a result of

imports."  *Wheatland*, 495 F.3d at 1362.  Thus, the *Wheatland* court expressly rejected the

relevance of distinctions in the type of harm being remedied under AD/CVD laws and section

201 duties:

> Antidumping duties remedy the harm of sales by a foreign exporter in the U.S.
> market at less than fair value. Countervailing duties remedy unfair competitive
> advantages that foreign exporters have over domestic producers as a result of
> foreign countervailable subsidies.  Section 201 safeguard duties remedy the
> injurious effects on domestic producers of a surge in imports. While all of these
> three types of duties remedy 'distinct harms' they are all directed at the same
> overarching purpose-protecting the bottom line of domestic producers.

*Id.* at 1363-64 (citations omitted).[3]

---

[3] In the *Final Results*, Commerce insisted that section 232 is not concerned with the "bottom line" of domestic producers, but with threats to national security.  PR Doc. 129 at 22.  As already discussed, however, section 232 is expressly directed as protecting the economic welfare of

When considered in the context of distinguishing special duties from normal customs duties, it is evident that section 232 duties are properly considered remedial duties to the same extent as AD/CVD duties and section 201 duties.  While section 232 is indeed concerned with threats to "national security," the specific nature of the national security threat addressed by the statute is the threat of imported merchandise causing economic injury to domestic industries that are deemed to be important to national security.

Moreover, Commerce and the President recognized an overlap between AD and CVD duties and section 232.  Commerce's press release announcing the section 232 investigation provided:

> Today President Donald J. Trump signed a presidential memorandum calling on Secretary Wilbur Ross to prioritize a Department of Commerce investigation initiated last night into the effects of steel imports on US national security. The study will consider overcapacity, dumping, illegal subsidies, and other factors, to determine whether steel imports threaten American economic security and military preparedness.

*Press Release:  Presidential Memorandum Prioritizes Steel Investigation*, in *Section 232 Investigation on the Effect of Imports of Steel on U.S. National Security*, U.S. DEP'T OF COMMERCE (Apr. 20, 2017), https://www.commerce.gov/issues/trade-enforcement/section-232-steel (last visited Aug. 20, 2021).  The President's memorandum observed "{t}he United States has placed more than 150 antidumping and countervailing duty orders on steel products, but they have not substantially alleviated the negative effects that unfairly traded imports have had on the United States steel industry."  PR Docs. 107-108 at Attachment 1.  Thus, contrary to Commerce's conclusion in the *Final Results*, the section 232 duties plainly were adopted in part to alleviate the negative effect of unfairly traded imports.  PR Doc. 129 at 22.  Section 232 duties

---

domestic industries adversely affected by imports.  Indeed, the *Steel Report* included several figures analyzing the steel industry's bottom line.  85 Fed. Reg. at 40,216-18 (figures 8-10).

are thus clearly remedial in the sense identified in *SSWR from Korea* and the decision of the Federal Circuit in *Wheatland.*

### 2.     Section 232 Duties Are Temporary

In *Wheatland*, the Federal Circuit agreed with Commerce that section 201 duties were distinguishable from normal customs duties (*i.e.*, "United States import duties") because they are temporary in nature while normal customs duties have no termination provision and are permanent unless modified by Congress.  495 F.3d at 1362.  Although Congress did not impose a specific time limit on section 232 duties, it is nevertheless clear that they are temporary in nature and do not require congressional action to be terminated.  Section 232(c)(1)(A)(ii) requires the President to specify at the outset "the . . . duration of the action" he chooses to remedy the threat to the national security.  19 U.S.C. § 1862(c)(1)(A)(ii).  At a minimum, that duration is limited to the time in which the national security threat the President identifies exists.  *See Universal Steel Prods., Inc. v. United States*, 495 F. Supp. 3d 1336, 1350-51 (Ct. Int'l Trade 2021) ("{W}hen the President is required to 'determine the . . . duration' of the action, he must state and decide at that time the action's continuance in time, or the time for which the action will last.").  In this instance, *Proclamation 9705* directs the Secretary to continue to monitor imports of steel articles and to from time to time review the status of such imports with respect to national security, to inform the President of any circumstances that might indicate the need for further action by the President, and to inform the President of any circumstances that might indicate that the duties would no longer be necessary.  *Proclamation 9705*, 83 Fed. Reg. at 11,628.

Since the publication of *Proclamation 9705*, the President has modified the section 232 duties on steel articles on numerous occasions, including expanding, and reducing the countries covered, raising, and then lowering, the duty rates applicable to imports from Turkey, and expanding the scope of the duties to include certain downstream derivative products.  *See*

*Proclamation 9711*, 83 Fed. Reg. 13,361; *Proclamation 9740*, 83 Fed. Reg. 20,683;

*Proclamation 9759*, 83 Fed. Reg. 25,857; *Proclamation 9772*, 83 Fed. Reg. 40,429;

*Proclamation 9886*, 84 Fed. Reg. 23,421; *Proclamation 9894 of May 19, 2019 Adjusting Imports*

*of Steel Into the United States*, 84 Fed. Reg. 23,987 (May 23, 2019); *Proclamation 9980 of*

*January 24, 2020 Adjusting Imports of Derivative Aluminum Articles and Derivative Steel*

*Articles Into the United States*, 85 Fed. Reg. 5,281 (Jan. 29, 2020).  The majority of the entries

subject to this administrative review were subject to a proclamation that was only in effect for 9

months – *Proclamation 9772*.  More recently, the administration has announced a series of

General Approved Exclusions that have lifted the section 232 duties altogether for over one

hundred steel products from all countries.  *Section 232 Steel and Aluminum Tariff Exclusions*

*Process*, 85 Fed. Reg. 81,060 (Dep't Commerce Dec. 14, 2020).  It is thus clear that the section

232 duties, like section 201 safeguard duties, are temporary in nature.  In the *Final Results*,

Commerce did not address the temporary nature of the duties other than observe that the relevant

proclamations provided no indications when the duties would be lifted and to assert that Borusan

had presented "no evidence" the duties are temporary.  PR Doc. 129 at 23.

      In this Court's previous decision on this issue, the Court found that the fact that section

201 provides specific time limits within which the duties will end, while section 232 duties may

be terminated by the President at any time, is not a meaningful difference.  *Borusan*, 494 F. Supp.

3d at 1374-75.  Both types of duties are clearly temporary in nature and both kinds of duties are

clearly distinguished in this regard from normal customs duties, which are set by Congress and

remain in place unless modified by Congress.  *Id.*  Nothing in Commerce's reasoning in the

*Final Results* of this administrative review would justify reconsideration of this aspect of the

Court's holding.

3.      **Subtracting Section 232 Duties From EP Or CEP Results In Precisely The Type Of Double Remedy The Federal Circuit Rejected In** *Wheatland*

In the *Final Results*, Commerce failed to analyze the double counting issue in the manner articulated in *SSWR from Korea* and *Wheatland* and erroneously concluded that section 232 gives the President the authority to modify the application of the AD law.  In *Wheatland*, the Federal Circuit explained the double remedy problem as follows:

> Where there is a pre-existing dumping margin, deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice – first as 201 duties, and a second time as an increase in that dumping margin. Where there was no pre-existing dumping margin, the deduction of 201 duties from U.S. prices in an AD proceeding could create a margin. Nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results.

495 F.3d at 1363 (quoting *SSWR from Korea*, 69 Fed. Reg. at 19,160).

The exact same double counting issue arises with section 232 duties.  This can be seen in the following numerical example.  If an exporter sells an article of steel that is subject to an AD order in its home market for $110/ton and sells the same article to a purchaser in the United States for $100/ton, then the dumping margin is $10 (the normal value of $110 – the EP of $100). The importer will therefore be assessed an AD duty of $10.  If the President then imposes a section 232 duty of 25 percent on that article, the importer will now be liable for a $25 section 232 duty in addition to the AD duty of $10, bringing the importer's total liability for the two types of duties to $35.  However, if, as it did here, Commerce treats the section 232 duty as a normal customs duty and subtracts it from the EP, the dumping margin would increase by the amount of the section 232 duty (normal value of $110 – adjusted EP of $75/ton = $35).  The importer would now be assessed an AD duty of $35 plus a section 232 duty of $25, for a total of $60 in trade remedy duties.  The section 232 duty is thus imposed twice, once as a section 232 duty and a second time as a dollar-for-dollar increase in the AD duty.

22

A similar phenomenon arises even when the foreign exporter is not dumping.  Returning to the previous example, if the exporter sells in the home market at $95/ton and sells the identical article to the United Sates at $100/ton, the normal value is less than the EP, so there is no dumping margin.  Consequently, the importer will be assessed no AD duty on that sale.  If the President imposes a 25 percent section 232 duty, the importer would now be assessed a section 232 duty on the sale of $25.  However, if Commerce also subtracts the section 232 duty from EP, then a dumping margin is created (normal value of $95/ton – adjusted EP of $75/ton = $20), and the importer would be assessed a total combined duty of $45, which is substantially greater than the section 232 duty imposed by the President.   In both of these examples, the foreign producer's pricing behavior – the focus of the AD law – has not changed.  The AD duties are increased (or assessed in the first instance) solely due to the imposition of the section 232 duties on the same merchandise.

The latter circumstance is exactly what has happened here.  If section 232 duties are not deducted from BMB's EP or CEP, BMB's dumping margin would be *de minimis*.  That is, nearly the entire dumping margin is generated solely because of this double remedy, and this double remedy was especially more pronounced in this administrative review as the section 232 duties for most of the POR were at 50 percent.

Commerce misstated how its decision regarding the deduction of section 232 duties would affect existing AD duties.  Commerce asserted that treating section 232 duties as special duties would result in a reduction in AD duties.  *See* PR Doc. 129 at 23 ("No express reduction to antidumping duties by the amount of the section 232 duties is contained in the Presidential Proclamation.").  As the numerical examples above demonstrate, however, following the *Wheatland* rule would not reduce the AD duties imposed, but rather, would impose exactly the

same AD duties that would be imposed in the absence of the section 232 duties, while *also* imposing the exact amount of section 232 duties determined by the President without any reduction or offset.  In this way, the section 232 duties are imposed "in addition to" the AD duties, precisely as the proclamation directs.  *Proclamation 9705*, 83 Fed. Reg. at 11,629.  The issue is that when section 232 duties are treated as normal customs duties and subtracted from EP/CEP, AD duties are *increased*.  In *SSWR from Korea*, Commerce rejected precisely such a double-count on the basis that "nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results."  69 Fed. Reg. at 19,160.

Furthermore, Commerce erred in its apparent conclusion that the President could modify the operation of the AD laws through the exercise of his authority under section 232.  PR Doc. 129 at 23 ("Had the President intended that antidumping duties be reduced by the amount of section 232 duties imposed, the Presidential Proclamation would have expressed that intent.").  The question before Commerce was whether duties imposed pursuant to the authority Congress delegated in section 232 were "United States import duties" as Congress used that term in the AD law.  Instead of focusing on this question, Commerce seems to have wrongly concluded that the President could modify the operation of the AD statute by means of a proclamation issued under section 232.  Section 232 duties might impact the calculation of AD duties, depending on the interpretation of the AD statute.  But nothing in section 232 suggests that it grants the President the authority to modify the calculation of AD duties pursuant to the method that Congress laid down in the AD law.  This by itself renders Commerce's interpretation unreasonable and therefore not in accordance with law.

In its previous decision, this Court concluded that double counting of the sort rejected by Commerce in *SSWR from Korea* did not constitute a prohibited double remedy in this case of

section 232 duties.  The Court held that section 232 duties were distinguishable from section 201

duties because there was a "statutory interplay" between section 201 and the AD law that is not

present in the case of section 232.  *Borusan*, 494 F. Supp. 3d at 1375.[4]  The Court identified two

instances of such "interplay."  The first is a provision in section 201 that directs that if, in the

course of its investigation, the ITC has reason to believe that the increased imports are

attributable in part to dumping or subsidization, it is to notify Commerce "so that such action

may be taken as is otherwise authorized by such provisions of law."  *Id*.; 19 U.S.C. § 2252(c)(5).

The second instance is the statement in the Uruguay Round Agreements Act Statement of

Administrative Action that in setting the level of relief provided under section 201, the President

is to consider relief already provided under the AD/CVD law.  *Borusan*, 494 F. Supp. 3d at 1375

(citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No.

103-316, vol. 1, at 964 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4267).

　　　Plaintiffs respectfully submit that neither of these two instances is sufficient to

distinguish section 232 duties from section 201 duties with regard to the issue of double-counting.

Because section 201 investigations are conducted solely by the ITC, which has no authority to

make dumping or subsidy findings, it makes sense that the statute would direct the ITC to refer

any apparent evidence of dumping or subsidization to Commerce for investigation.  No

comparable cross-reference is necessary in the case of section 232, where the investigation is

conducted by Commerce and the ITC has no role.  And that the President is directed under

section 201 to consider existing AD/CVD duties in setting the level of section 201 duties begs

the question of whether the section 201 duties should be subtracted in calculating the amount of

---

[4] This decision is currently on appeal at the Federal Circuit.  *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 2021-2097.  Any decision rendered in that appeal regarding treatment of section 232 duties in the AD calculation should be given effect in this appeal.

the AD duties.  So, the absence of an explicit statement in the legislative history of section 232 that the President should consider existing AD/CVD duties is of no moment with regard to the issue of double counting.[5]  As the Federal Circuit held in *Wheatland*, the relevant question remains whether there is any indication in the legislative history of either section 232 or the AD law that Congress intended section 232 duties to be effectively applied a second time in the case of goods that are also subject to AD duties.  495 F.3d at 1362-63.  Plaintiffs submit that Commerce has identified no evidence of such an intent on the part of Congress.

Moreover, the previous decision by this Court also fails to account for "interplay" between section 232 and Commerce's AD/CVD regulations.  Commerce's regulations provide that domestic producers who file petitions requesting relief under the AD or CVD laws must identify in the petition any previous instances in which they have sought other forms of import relief on the same merchandise, including relief under section 201 and relief under section 232. 19 C.F.R. § 351.202(b)(4).  Thus, to the extent the Court deems such interplay to be relevant to the double counting issue, Commerce's own regulations treat section 232 duties as equally "complimentary" as section 201 duties by requiring that petitioners identify previous instances of either form of relief that have been requested for the same merchandise when seeking relief under the AD/CVD laws.

In any event, the "statutory interplay" rationale was not relied on by Commerce in the *Final Results* as a basis for distinguishing section 201 duties and section 232 duties with respect to the double counting issue.  Courts "must judge the propriety of {an agency's} action solely by the grounds invoked by the agency."  *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Scott v. Wilkie*, 920 F.3d 1375, 1380 (Fed. Cir. 2019) ("The Veterans Court

---

[5]  In any event, both the President and the Secretary clearly considered the AD and CVD orders on steel products in determining the remedy under section 232.  *See supra* at 5 and 17-18.

26

cannot simply 'chisel that which must be precise from what the agency has left vague and indecisive.'") (citing *Chenery*, 332 U.S. at 197 ).  In *SSWR from Korea,* Commerce did discuss the two instances of "interplay" between AD duties in section 201 noted by the Court.  However, Commerce did so in the context of considering whether section 201 duties are remedial, not in its consideration of the double counting problem:

> In other words, the injury to the U.S. industry which is the subject of an inquiry under Section 201 may be remediable (at least to some extent) under the AD law. To some extent, 201 duties are interchangeable with special AD duties. *It follows that 201 duties are more appropriately regarded as a type of special remedial duty, rather than ordinary customs duties.*

*SSWR from Korea*, 69 Fed. Reg. at 19,160 (emphasis added).  That Commerce deemed these references to AD duties in section 201 to support the conclusion that both types of duties are remedial does not indicate that the absence of such explicit references in the section 232 statute distinguishes the latter on the issue of double counting.  Section 201 duties and section 232 duties operate in exactly the same manner, and both are double counted in the AD calculation if treated as ordinary customs duties and subtracted from EP or CEP.

>      4.      **Congress' Delegation Of Authority To The President To Impose Duties Under Section 232 And The President's Subsequent Modification To Chapter 99 Of The Harmonized Tariff Schedule Demonstrate That Section 232 Duties Are "Special Duties" As Opposed To "Ordinary" Customs Duties**

Commerce's treatment of Section 232 duties as "ordinary" customs duties ignores constitutional principles and the statutory scheme established by Congress which "vests in Congress the sole authority to impose tariffs" but allows the President to impose special duties such as those under section 232.  Renegotiation Amendments Act of 1968, S. Rep. No. 90-1385, pt. 2, at 13 (1968).  Article 1, section 8 of the U.S. Constitution provides that Congress is responsible for levying and collecting taxes and duties.  The courts have interpreted this to mean that "{t}he general power to modify the HTSUS belongs exclusively to Congress."  *Forest Labs.,*

*Inc. v. United States*, 29 CIT 1401, 1406, 403 F. Supp. 2d 1348, 1352 (2005); *see also* 19 U.S.C.

§ 3004 (1994).  Congress has given the President limited authority to make modifications to the

HTSUS based solely within the framework of statutorily defined objectives.  *Id.*  While Congress

has delegated to the Executive Branch the limited authority to apply special duties in certain

circumstances such as safeguard duties, AD and CVD duties, section 232 duties, and duties

implemented under section 301 of the Trade Act of 1974, *as amended*, 19 U.S.C. § 2411, for the

specific remedial purposes specified in each of those statutes, Congress has never delegated to

the President any general authority to modify tariff rates or to set "ordinary" customs duties.

This power to set "normal" customs duties lies solely with Congress, and thus any authority

delegated by Congress to the President to impose duties is by definition an example of a "special"

situation and a "special" duty.

   Furthermore, the placement of the modification to the HTS in Chapter 99 to impose the

section 232 duties demonstrates the prior Administration's acknowledgement that these are in

fact "special" duties as opposed to normal customs duties.  Both the history of Chapter 99 and

Commerce's past statements about Chapter 99 support this proposition.  Chapters 1 to 97 of the

HTS are used for normal customs duties whereas Chapter 99 is specifically reserved for special

duties imposed under "temporary legislation, temporary modifications established pursuant to

trade legislation, {and} additional import restrictions established pursuant to section 22 of the

Agricultural Adjustment Act, as amended."  Harmonized Tariff Schedule of the United States

(2021) Revision 7, Ch. 99.

   Chapter 99 of the HTSUS first emerged during the transition from the Tariff Schedules of

the United States ("TSUS") to the harmonized system.  During this transition, the ITC prepared a

report detailing all of the changes to the tariff schedule that took places as a result of the

conversion.  When discussing Chapter 99, the ITC explained that "Chapter 99 is designed for the

incorporation of legislation, proclamations, and administrative actions, which, because of their

temporary or collateral nature, are not assimilated into the main body of the tariff schedule."

*Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the*

*Harmonized System*, Inv. No. 332-131, USITC Pub. 1400 (June 1983) at 16 n.1 & 28.  Thus,

from the outset, Congress and the ITC envisioned Chapter 99 being used for special situations

that "are not assimilated into" chapters 1-97 of the HTSUS.

Commerce previously recognized that Chapter 99 contains "special" duties.  In *SSWR*

*from Korea*, Commerce noted that Chapter 99 "is reserved for special or temporary duties."  69

Fed. Reg. at 19,160.  In the *Final Results*, Commerce dismisses this statement by asserting that

"this was not the sole basis upon which Commerce declined to adjust U.S. prices for section 201

duties."  PR Doc. 129 at 24.  The point, however, is not whether this was the sole reason for

Commerce's decision not to deduct section 201 duties.  Rather, the point is that Commerce

recognized that the placement of these duties in Chapter 99 was evidence that they were not

normal customs duties, but special duties.  Commerce nowhere explains why a different

conclusion should apply with respect to section 232 duties.  The placement of section 232 duties

within Chapter 99 signifies the legal status of section 232 duties as special, remedial duties

imposed by the President pursuant to specific grant of delegated authority, rather than ordinary

customs duties set by Congress.

**C.      Commerce's Determination To Deduct Section 232 Duties From U.S. Price In
         Excess Of 25 percent Is Unsupported By Substantial Evidence And Is
         Otherwise Not In Accordance With Law**

If this Court nevertheless decides that Section 232 duties can be treated as U.S. import

duties and deducted from EP and CEP, Plaintiffs argue in the alternative that the deduction must

be limited to only the 25 percent duty rate that lawfully applies to such entries.  *Proclamation*

*9772* authorizing section 232 duties collected in excess of 25 percent was held to be unlawful and unconstitutional by this Court. *Transpacific*, 466 F. Supp. 3d at 1259-60. That decision has been reversed by a three judge panel of the Federal Circuit, but as of the date of submission of Plaintiffs' motion for judgment on the agency record, the results of that appeal are not final and a petition for rehearing and rehearing *en banc* is pending. Combined Petition for Panel Rehearing and Rehearing *En Banc* of Plaintiffs-Appellees, *Transpacific Steel LLC v. United States*, No. 2020-2157 (Fed. Cir. Aug. 23, 2021), ECF No. 68. Significantly, the unlawfully collected section 232 duties were refunded for the entries of standard pipe on appeal, and Commerce's deduction of section 232 duties in excess of those actually imposed is unlawful. *See* PR Doc. 125.

   *Proclamation 9772*, which increased the section 232 duties on Turkey from 25 percent to 50 percent, went into effect on August 13, 2018. 83 Fed. Reg. 40,429. The increased tariffs on Turkey were lowered back down to 25 percent, effective May 21, 2019. *Proclamation 9886*, 84 Fed. Reg. 23,421. This nine-month period during which 50 percent section 232 duties were collected on steel imports from Turkey overlaps with a significant portion of the POR subject to this appeal and covers many of the entries subject to the administrative review.

   Shortly before the Government needed to give effect to this Court's judgment in *Transpacific* and refund the difference between the 25 percent and 50 percent section 232 duties, the Government sought a motion to stay the enforcement of judgment pending appeal to avoid issuing the refunds. However, on September 15, 2020, this Court denied the Government's motion. *Transpacific Steel LLC v. United States*, 474 F. Supp. 3d 1332 (Ct. Int'l Trade 2020). The Government subsequently filed a similar motion to stay enforcement of judgment at the Federal Circuit. *See* Defendants-Appellants' Motion to Stay Injunction Pending Appeal,

*Transpacific Steel LLC v. United States*, 840 Fed. Appx. 517 (Fed. Cir. 2020) (No. 2020-2157),

ECF No. 18.  That motion was also denied by the Federal Circuit on December 10, 2020.

*Transpacific Steel LLC v. United States*, 840 Fed. Appx. 517 (Fed. Cir. 2020).

When it became clear that CBP would refund all previously collected section 232 duties

in excess of 25 percent, Borusan informed Commerce of the change in the duty amount

applicable to those entries, and the need to limit the deduction of section 232 duties in the AD

margin calculation to only 25 percent.  Borusan first notified Commerce of these developments

on December 4, 2020.  PR Doc. 122.  At that point, Commerce had more than four months

before the *Final Results* were due to consider and address this issue.  *Id.* at 2.  Commerce did not

follow up with Borusan or issue any supplemental questions to Borusan.  Borusan again notified

Commerce on February 18, 2021 regarding the status of the *Transpacific* refunds.  PR Doc. 125.

In that letter, Plaintiffs advised Commerce that CBP was in the final stages of refunding half of

the section 232 duties collected on entries where Plaintiffs had paid 50 percent section 232 duties.

*Id.* at 2.  Plaintiffs also provided Commerce with a methodology for removing half of the section

232 tariffs on the *Transpacific* entries from the Section C database.  *Id.* at 2-4.

In the *Final Results*, Commerce declined to modify the treatment of section 232 duties in

its AD calculations.  First, Commerce stated that the *Transpacific* decision was not final.  Second,

Commerce stated that regardless of the finality of the litigation,

> 1) No evidence has been submitted to Commerce showing that refunds have been
> provided by CBP to the relevant importers in regards to the challenged Section
> 232 duties; 2) even if refunds have been granted, there is no evidence on the
> record that the exporters or producers set prices of subject merchandise to
> ultimate customers in reliance on a promise of potential post-sale refunds
> pursuant to subsequent court decisions; and 3) there is no evidence on the record
> of post-sale refunds from the exporters and producers to the ultimate consumers.

PR Doc. 130; PR Doc. 129 at 24 n.171.

Commerce may not lawfully refuse to give effect to a decision that was made by a three-judge panel of this Court.  The fact that this Court and the Federal Circuit denied the Government's motion to stay enforcement of the judgment underscores that decisions of this Court are effective upon the entry of judgment.  In the absence of a stay, final decision by this Court must be given effect.  In any event, it is likely that the *Transpacific* litigation will become final at some point during the pendency of this litigation. Commerce's first rationale for continuing to deduct the unlawfully collected section 232 duties will no longer apply at that point.[6]

Commerce's other stated reasons for not removing the unlawfully collected section 232 duties from the deduction to EP/CEP are equally meritless.  First, Commerce accuses Plaintiffs of not providing evidence that the section 232 duties have been refunded to BMB and BMP.  PR Doc. 130.  Plaintiffs alerted Commerce about the *Transpacific* case and the judgment ordered in that case four months before the *Final Results* were set to be issued.  PR Doc. 122.  If Commerce required additional evidence on this point, there was ample time to request it.  However, Commerce never issued a follow up supplemental questionnaire or asked BMB or BMP to provide any additional evidence to demonstrate receipt of the refunds.  Nevertheless, between February 17, 2021 and March 23, 2021, BMB and BMP received all of the refunds of the unlawfully collected section 232 duties.

The second and third reasons provided by Commerce are not relevant to the issue of whether Commerce can deduct duties from U.S. price that have been declared

---

[6] Should the Federal Circuit deny the petition for rehearing and rehearing *en banc* and should the U.S. Supreme Court deny any petition for certiorari, the remaining arguments in this section will be moot.

unlawful and have been refunded.  There is no longer any section 232 duties over 25

percent that exist on the entry of the merchandise during the period when *Proclamation*

*9772* was in effect.  Dumping margins cannot be assessed using deductions from U.S.

price based on section 232 duties that were unlawfully collected and have been refunded

to the importer/producer.  It follows that only the actual, final amount of section 232

duties imposed on the merchandise can be deducted if this Court agrees that such duties

can be deducted from the EP and CEP.  Commerce's assertions that "there is no evidence

on the record that the exporters or producers set prices of subject merchandise to ultimate

customers in reliance on a promise of potential post-sale refunds pursuant to subsequent

court decisions," and "there is no evidence on the record of post-sale refunds from the

exporters and producers to the ultimate consumers," are not relevant to the question of

whether these duties were properly deducted from U.S. price when they have been

declared invalid.  PR Doc. 130.  This is solely a transaction between BMB/BMP and CBP

whereby CBP refunded certain section 232 duties and those refunded duties need to be

removed from the deduction to EP and CEP.  Commerce's stated reasons for not

decreasing the amount of section 232 duties to be deducted from EP/CEP is unsupported

by substantial evidence nor is it in accordance with law.

## VII.   <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs respectfully request that this Court (i) hold that Commerce's *Final Results* are not supported by substantial evidence and are otherwise contrary to law, (ii) remand the case to Commerce with instructions to correct the errors identified by the Court and recalculate BMB's dumping margin, and (iii) order such further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Edward J. Thomas, III
Jordan L. Fleischer

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiffs Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Mannesmann Pipe U.S. Inc.*

12917228–1

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 10,788 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

**/s/ Julie C. Mendoza**